IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AILEEN R. CARR, | ) | CASE NO. 3:18CV1639 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JEFFREY J. HELMICK |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Aileen Carr ("Carr") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth below, the ALJ did not provide analysis or explanation to support her credibility determination, which compromised the ALJ's analysis of the opinions of Carr's treating physician and the state agency reviewing physicians.  Moreover, the ALJ improperly prevented counsel from examining the VE at the hearing.  Thus, the undersigned is unable to determine whether the ALJ's decision is supported by substantial evidence.  Accordingly, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED** for proceedings consistent with this opinion.

## I. Procedural History

On December 10, 2014, Carr filed an application for DIB, alleging a disability onset date of October 17, 2012.  Tr. 223.  She alleged disability based on the following: a sprain, a "SLAP"

tear, impingement, and osteoarthritis in her right shoulder; and a ruptured and bulging disc in her back. Tr. 247. After denials by the state agency initially (Tr. 117) and on reconsideration (Tr. 135), Carr requested an administrative hearing. Tr. 156. A hearing was held before an Administrative Law Judge ("ALJ") on August 3, 2017. Tr. 35-101. In her November 24, 2017, decision (Tr. 11-27), the ALJ determined that there are jobs that exist in the national economy that Carr can perform, i.e., she is not disabled. Tr. 26-27. The Appeals Council denied Carr's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Carr was born in 1968 and was 46 years old on the date she filed her application. Tr. 223. She graduated from high school and previously worked as a cleaner, hand packager, and daycare worker. Tr. 44, 88. She last worked in October 2012. Tr. 44.

### B. Relevant Medical Evidence[1]

Carr injured her right shoulder at work in July 2012. Tr. 397. She was lifting something and she heard a pop. Tr. 397. An MRI showed a strong suggestion of a superior labral tear from anterior to posterior ("SLAP") and moderate osteoarthritis of the acromioclavicular joint ("AC joint").[2] Tr. 707. She was diagnosed with a shoulder sprain/strain and a SLAP tear. Tr. 708, 398.

On September 25, 2012, Carr saw William Sanko, M.D. Tr. 397. She was on restrictions: no overhead activities and no lifting more than 10 pounds. Tr. 397. X-rays showed some significant AC joint arthritis and a little bit of osteolysis or cystic changes involving the

---

[1] Carr only challenges the ALJ's decision with respect to her assessed RFC limitations on handling and fingering. Doc. 15, p. 14. Thus, only the medical evidence that relates to the impairment causing that issue (her shoulder and cervical spine impairment) is summarized and discussed herein.

[2] The acromioclavicular joint is between the acromion and clavicle. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 20.

greater tuberosity, the prominent area of bone at the top of the humerus. Tr. 398. Dr. Sanko recommended arthroscopic surgery upon Bureau of Worker's Compensation ("BWC") approval; in the meantime, Carr was to continue light duty work and take over-the-counter anti-inflammatories during the day and Flexeril at night. Tr. 398.

On November 8, Carr reported that she tried to continue working but had been off work since October. Tr. 395. Dr. Sanko added a diagnosis of probable impingement syndrome/bursitis and gave her a prescription for Vicodin. Tr. 395.

On January 9, 2013, Dr. Sanko performed arthroscopic surgery on Carr's right shoulder. Tr. 392, 751. On January 17, Carr followed up with Dr. Sanko, who reported that he had not sent her to physical therapy but that she was working on range of motion on her own. Tr. 390. He observed that her shoulder was very stiff and stated that it was important she begin an aggressive course of therapy to get the shoulder moving again. Tr. 390. She returned to Dr. Sanko on February 19 and had a near full range of motion and some guarding. Tr. 388. Dr. Sanko advised she continue physical therapy, use her arm more normally, and that, in a follow-up in four weeks, they would discuss her return to work assuming she is pain free. Tr. 388. Dr. Sanko gave her a steroid injection in her shoulder. Tr. 388.

On March 19, 2013, Carr reported to Dr. Sanko that she was "still having quite a bit of problems with her right shoulder, and in some ways maybe a little more." Tr. 386. She complained of sharp intermittent pain when she used her shoulder at times. Tr. 386. She had been through physical therapy and the injection helped a little bit but not significantly. Tr. 386. Upon exam, she had a full range of motion, full strength, no signs of impingement and no tenderness over her AC joint. Tr. 386. Dr. Sanko continued her therapy and ordered another MRI. Tr. 386-387. The MRI on May 5 showed a chronic SLAP tear most notable posterior to

the biceps labral anchor, where there was high-grade chondromalacia and almost a labral detachment.  Tr. 1092.  It also showed moderate capsulitis and tenosynovitis.  Tr. 1092.

On May 21, 2013, Carr returned to Dr. Sanko for a follow-up.  Tr. 772.  She reported no improvement, and that she still has some painful catching and popping in her right shoulder.  Tr. 772.  Upon exam, she had a good range of motion and strength.  Tr. 772.  He listed her MRI as showing a persistent SLAP tear, mild osteoarthritis, mild bursitis, and mild adhesive capsulitis. Tr. 772.  Dr. Sanko recommended additional surgery: a biceps tenodesis arthroscopy with a period of immobilization.  Tr. 772.

On July 23, 2013, Dr. Sanko performed the second surgical procedure.  Tr. 844.  On August 1, she saw Dr. Sanko for a follow up and reported an issue with pain and numbness and tingling in her arm.  Tr. 378.  Dr. Sanko advised she continue using her sling and ordered physical therapy to work on some motion and gentle strengthening and prescribed Norco.  Tr. 378.  At therapy, Carr reported frequent pain.  E.g., Tr. 832.

On August 22, Carr returned to Dr. Sanko. Tr. 376.  She complained of some numbness and tingling and did not seem to be improving.  Tr. 376.  Upon exam, she had a good range of motion and strength.  Tr. 376.  Dr. Sanko wrote, "At this point I imagine it may be a little more of a neurapraxia of the musculocutaneous nerve" which should resolve with time.  Tr. 376.  He continued therapy to start some active range of motion and stated that her sling was optional.  Tr. 376.

On September 19, 2013, Carr followed up with Dr. Sanko.  Tr. 841.  She reported still having quite a bit of pain, as well as popping and catching in her shoulder.  Tr. 841.  Dr. Sanko remarked that, objectively, her shoulder was doing "fairly well," with some pain and guarding, no crepitance, and good strength.  Tr. 841.  She still had numbness.  Tr. 841.  He recommended a

subacromial injection, which he performed; and recommended she continue to take ibuprofen and refilled her Vicodin, to be taken sparingly.  Tr. 841.

On October 31, 3013, Dr. Sanko remarked that Carr was still painful and symptomatic. Tr. 372.  He stated that she could remain off work and continue physical therapy.  Tr. 372.  On December 5, she had a full range of motion, good strength, light guarding, and occasionally clicking and popping with range of motion, although Dr. Sanko could not pinpoint where.  Tr. 370.  She was cleared to return to work on light duty restrictions and advised that she could visit pain management for chronic pain issues.  Tr. 370.

On January 16, 2014, Carr saw Dr. Sanko, who remarked that she "was still having a lot of pain in that shoulder for some reason."  Tr. 691.  Upon exam, Dr. Sanko found that, objectively, her shoulder was doing well, with a full range of motion, good strength, and some equivocal impingement signs.  Tr. 691.  Her numbness and tingling seemed to be resolving.  Tr. 691.  Dr. Sanko was at a loss, citing difficulty with pain and getting her back to work.  Tr. 691. He recommended she see his colleague, Dr. Patel, for a second opinion and use over-the-counter medication.  Tr. 691.

On February 18, 2014, Carr saw Dr. Patel; upon exam, she had breakaway weakness, anterior joint line pain, exquisite tenderness in her AC joint, and a very positive Hawkins' maneuver.  Tr. 366.  Based on her exam findings and reports of pain, Dr. Patel ordered an MRI. Tr. 366.  On April 22, Carr returned to Dr. Patel; the MRI showed progressive, degenerative changes of the glenohumeral articulation with osteophyte formation, a chronic labral tear and partial thickness cuff pathology of the supraspinatus.  Tr. 363–364.  Upon exam, she had 5/5 strength with muscle guarding and breakaway observed due to pain, and positive Hawkins and O'Brien's tests.  Tr. 363.  She had full sensation in her hands and reported some altered sensation

5

in her forearm.  Tr. 363.  Dr. Patel referred her to Dr. Gobezie for an evaluation for biological resurfacing.  Tr. 364.

On May 21, 2014, Carr saw Reuben Gobezie, M.D.  Tr. 413.  Dr. Gobezie opined that her shoulder pain was osteoarthritic in nature, with development of humeral head bony pitting and biceps tendinitis.  Tr. 414.  Dr. Gobezie planned a total shoulder replacement surgery.  Tr. 414.

On October 22, 2014, Carr saw Dr. Gobezie for a follow-up visit; she had received authorization for her surgery.  Tr. 1028.  She reported that her pain was aggravated by lying down, lifting, carrying, pushing/pulling, weight bearing, exercise and changing her clothes.  Tr. 1028.

On January 26, 2015, Dr. Gobezie performed a right shoulder replacement and an open capsular release.  Tr. 650.

From February 3 to March 5, Carr had 15 sessions of physical therapy.  Tr. 458.  On her first visit she reported severely disrupted sleep (up to five times per night) that improved a few weeks later to 3 to 5 times per night, and by March 5, only one to two times a night.  Tr. 460.  She could not lift medium weight or reach overhead with her right arm.  Tr. 460.  An x-ray of her right shoulder taken on March 11 showed no evidence of hardware fracture or lucency.  Tr. 750.

Carr saw Dr. Gobezie for a follow-up appointment in April 22, 2015.  Dr. Gobezie stated that her shoulder was doing well overall, prescribed another course of physical therapy, and advised Carr to stop all narcotics and take ibuprofen or Tylenol instead.  Tr. 595.

Carr returned to Dr. Gobezie on July 31, reporting 8/10 pain.  Tr. 593.  She had not had physical therapy for six weeks because BWC hadn't received the necessary paperwork.  Tr. 593.  She had tripped over her dog, which was affecting her right shoulder.  Tr. 593.  She requested a referral to a physician closer to her home.  Tr. 593.

On October 7, 2015, Carr saw Darin Nye, M.D., for her right shoulder, explaining that her pain was worse than before her surgery.  Tr. 916.  Her pain was exacerbated by overhead activity and lying in bed.  Tr. 916.  She was currently taking Advil and Tylenol and her pain was 10/10.  Tr. 916.  Upon exam, she generally had 4/5 strength, moderate tenderness of the greater tuberosity with mild tenderness over the acromioclavicular joint, positive Neer's and Hawkins tests, and intact sensation.  Tr. 916.  She had x-rays taken, and Dr. Nye opined that, based on her history, he was unsure why she underwent total shoulder arthroplasty, and that there were no findings on her x-rays to correlate with her pain.   Tr. 917.  He advised that she obtain her medical records, continue with over-the-counter medication, and return in two weeks.  Tr. 917.

Two weeks later, Carr saw Dr. Nye; her records had been sent to the wrong doctor and Dr. Nye still did not have her records.  Tr. 1079.  Her pain was 9/10 and she also complained of weakness in her shoulder and denied radicular pain.  Tr. 1079.  Dr. Nye opined that she may have low-grade clinical infection or loosening of the surgical hardware.  Tr. 1080.  He advised Carr to call again to have her medical records sent, and recommended blood work and a steroid injection, which she had on November 11.  Tr. 1080, 1077.

On December 16, 2015, Carr saw Dr. Nye and reported that the injection did not help at all and caused side effects.  Tr. 1073.  She also complained of radiating pain down her arm, which, she stated, has been present since her initial injury.  Tr. 1073.  Her pain was currently 10/10, over-the-counter medication was inadequate, and her pain was made worse by pushing, pulling, lifting, and reaching, and better with immobilization.  Tr. 1073.  She requested a sling to wear while sleeping.  Tr. 1073.  Her exam findings were the same as her prior visits.  Tr. 1074.  Based on her new complaints of radicular pain, Dr. Nye ordered a cervical spine MRI and an EMG, and prescribed Ultram.  Tr. 1074.

On February 8, 2016, Dr. Nye reported that the cervical MRI showed mild to moderate foraminal stenosis on the right at C4-5 secondary to facet arthritis and that her EMG was normal. Tr. 1071.  He recommended they rule out cervical spine etiology of her pain and referred her to physical therapy for her cervical spine and to Dr. Bret Bahn for a steroid injection at C4-5.  Tr. 1071.

On February 23, Carr started physical therapy; after 10 visits she reported, on March 14, that she had 10% improvement in her neck and shoulder blade symptoms.  Tr. 1009.  Her shoulder symptoms were the same.  Tr. 1009.

On March 21, 2016, Carr saw Dr. Nye and reported no change in her symptoms.  Tr. 1067.  He remarked that physical therapy had not been helpful and noted that she had missed and rescheduled her appointment with Dr. Bahn.  Tr. 1068.  At her April visit with Dr. Bahn, Carr reported taking Tramadol and Gabapentin and described neck pain radiating to her shoulder and down her right arm.  Tr. 1068.  Dr. Bahn diagnosed cervical radiculopathy, cervical disc degeneration and cervical spondylosis, and recommended an injection.  Tr. 1007.

Carr returned to Dr. Nye on May 4, 2016.  Tr. 1065.  Ultram provided mild relief.  Tr. 1065.  She had seen Dr. Bahn and was scheduled for a cervical injection in two weeks.  Tr. 1066.

On August 2, Carr reported to Dr. Nye that her cervical injection did not significantly help her shoulder pain but reported about 20% improvement in her shoulder pain since her last visit.  Tr. 1062.  She complained of mild baseline shoulder pain and sharp, moderate to severe pain with movement of her shoulder or lying on her right side. Tr. 1062.  Dr. Nye discussed her options, including a bone scan and blood work to investigate an infection or loosening of the surgical hardware, which Dr. Nye thought was unlikely, and Carr elected to proceed with these options.  Tr. 1063.

On September 7, Carr's pain was 9/10 and exacerbated because she had been using crutches after knee surgery she had undergone about a week prior.  Tr. 1059, 919.  Dr. Nye questioned Carr about metal allergies and indicated that he would attempt to confirm the type of metal used in her shoulder hardware.  Tr. 1060.

On October 31, 2016, Carr rated her shoulder pain 8/10.  Tr. 1056.  Upon exam, her shoulder was stable and intact to light touch.  Tr. 1057.  Her strength was noted to be 4+/5, with full active forward flexion and passive range of motion equal to the left shoulder.  Tr. 1057.  Dr. Nye referred her to allergy testing for nickel and titanium.  Tr. 1057.

On November 30, 2016, Carr saw Amber Patterson, M.D., to determine whether her right shoulder pain could be related to a hardware allergy.  Tr. 1013.  She returned on December 19 to discuss the results of the testing, and it was indicated that a relevant contact allergen had not been identified, although she tested positive for gold and thiuram and she was advised to avoid those substances and to return for titanium testing.  Tr. 1012.

On April 5, 2017, Carr saw Dr. Nye, who encouraged her to be tested for titanium and recommended a right biceps tendon steroid injection, which was performed on May 1.  Tr. 1177, 1175.

On June 20, 2017, Carr saw Dr. Nye and reported no improvement from her injection. Tr. 1171.  Her pain was 10/10, intermittent, and radiated down into her hand.  Tr. 1171.  Upon exam, she had full active flexion of her shoulder with no instability and 4/5 strength; 5/5 strength in her rotator cuff musculature and throughout her upper extremity; and intact sensation.  Tr. 1171.  Dr. Nye diagnosed osteoarthritis of the right shoulder, with unknown cause of persistent right shoulder pain.  Tr. 1171.  An EMG performed in July was normal and unchanged since her prior EMG in January 2014.  Tr. 1183.

### C. Opinion Evidence

#### 1. Treating source

Dr. Nye completed two assessments of Carr's work-related abilities.  On July 5, 2017, he opined that Carr could sit, stand, and walk for one hour at a time for a total of two hours during a workday, and would need to change positions throughout the workday at will and leave the workstation at least once every hour for ten minutes to move/stretch.  Trt. 1179.  She could not perform overhead lifting with her right arm, could perform fine manipulation on a frequent basis with her right upper extremity, could rarely use her right arm for gross manipulation, and could lift one to two pounds frequently and up to five pounds occasionally.  Tr. 1179.  Her pain would cause her to be off task more than 20% of the time and he expected she would likely miss more than three days of work per month due to exacerbations of her impairment.  Tr. 1179.

A month later, on August 1, 2017, Dr. Nye completed a second assessment using the same form.  Tr. 1181.  He opined that Carr could sit, stand, and walk for eight hours at a time per day.  Tr. 1181.  She would not need to change positions and would not need to leave the workplace to stretch.  Tr. 1181.  She could lift up to ten pounds occasionally and no weight frequently, could not lift overhead with the right upper extremity, could rarely use her right arm for gross manipulation, and could frequently use her right hand for fine manipulation.  Tr. 1181.  Depending on the activity, her pain would cause her to be off task more than 20% of the time.  Tr. 1181.  She would likely miss more than three days of work per month due to exacerbations of her impairment.  Tr. 1181.  He stated that these restrictions had been in effect at least since November 11, 2015.  Tr. 1181.

#### 2. Consultative examiner

July 10, 2015, Carr saw B.T. Onamusi, M.D., for a consultative examination for her

shoulder and low back pain. Tr. 577-583. Carr reported being able to: perform fine motor activities with both hands and personal grooming; drive; and do laundry and grocery shop with assistance. Tr. 582. Upon exam, she had normal manual muscle testing of her upper extremities, including her shoulders; normal hand function in both hands (grasp, manipulation, pinch, fine coordination), with stronger grip strength in the left hand (20 pounds) than the right (10 pounds). Tr. 577. She could reach forward, push and pull. Tr. 582-583. She had no shoulder tenderness but she had pain at the extremes of ranges of motion. Tr. 583. Dr. Onamusi assessed status post shoulder replacement with significant loss of range of motion. Tr. 583. He opined that she could perform work at the light exertional level and would have difficulty using her right upper extremity for any activity above waist level. Tr. 583.

### 3. BWC opinions

On September 14, 2015, Carr saw Maria Armstrong–Murphy, M.D., for a BWC evaluation. Tr. 907–909. Upon exam, she had severe shoulder tenderness with girdle muscle atrophy, scarring, joint deformity and crepitus. Tr. 908. She had intact sensation, diminished motor strength, and signs of impingement. Tr. 908. Dr. Armstrong-Murphy opined that Carr had reached maximum medical improvement and recommended maintenance care and a home exercise program (HEP). Tr. 908. It was unlikely that she would return to her past job. Tr. 909. She had the following, permanent restrictions: she could continuously lift 10 pounds, frequently lift up to 20 pounds, and occasionally lift up to 50 pounds, but she could not lift above her shoulders with her right arm. Tr. 910.

On January 22, 2016, Carr was evaluated by James Hoover, M.D., in connection with her BWC claim. Tr. 424–427. Dr. Hoover opined that she would not be able to return to the job that she was doing at the time of her injury and recommended a HEP "and being as

reasonably active is about all she can do." Tr. 426.  He opined that she had the following permanent restrictions: she could occasionally lift up to 20 pounds, occasionally reach below her knee with her right arm, and could never push or pull with her right arm or lift above shoulder level or perform "repetitive activities" with her right hand.  Tr. 427.

On October 26, 2016, Carr was evaluated by Thomas Markham, M.D., in connection with her BWC claim.  Tr. 929-930.  Upon exam, her shoulder was stable, she had no deformity, and she had tenderness, crepitus, and a positive impingement sign.  Tr. 929.  Dr. Markham opined that Carr was not at maximum medical improvement and that she had a 12% permanent, partial impairment.  Tr. 930.

On January 2, 2017, Carr saw Daniel Lollar, D.C., in connection with her BWC claim.  Tr. 932-933.  Regarding Carr's percentage of permanent, partial disability for BWC purposes, Dr. Lollar found that she had a 28% whole person impairment.  Tr. 933.

### 4. State Agency Reviewers

On July 24, 2015, state agency reviewing physician Gary Hinzman, M.D., reviewed Carr's record.  Tr. 112-114.  Regarding her residual functional capacity, Dr. Hinzman opined that Carr could perform light work (stand, walk and/or sit about six out of eight hours, occasionally lift 20 pounds and frequently lift 10); could never crawl or climb ladders, ropes or scaffolds; could not reach overhead with her right upper extremity and could only perform occasional gross manipulation with that arm; and must avoid even moderate exposure to hazards (no unprotected heights or commercial driving).  Tr. 112-114.

On October 23, 2015, state agency reviewing physician Esberdado Villanueva, M.D., adopted Dr. Hinzman's findings.  Tr. 130–132.

### D.  Testimonial Evidence

### 1. Carr's Testimony

Carr was represented by counsel and testified at the administrative hearing. Tr. 38.  She testified that she primarily lives alone in a first-floor apartment, although her fiancé started staying over a couple of times a week to help her out since her recent knee surgery.  Tr. 59, 61.  She has a driver's license and drives, although she was currently unable to because of her knee surgery.  Tr. 58.  She also had problems being a passenger in a car because her back would hurt from having to sit for any period of time.  Tr. 58.  Currently, she is having physical therapy for her knee.  Tr. 60.

Carr stated that she is still having problems with her right shoulder.  Tr. 61-62.  She sees Dr. Nye for her shoulder, and he had ordered an EMG.  Tr. 62-64.  Dr. Nye said that he has done everything possible for her shoulder and the only thing left to do was to replace it again, and she had replied that she did not really want to go through all that again.  Tr. 64.  Her shoulder "is what it is" and it's not going to get better.  Tr. 64.  She can reach up, but, due to pain, she cannot reach overhead.  Tr. 65.  She cannot reach to the rear; she cannot move her arm back beyond her side.  Tr. 65.  She also has problems reaching out to the side; she can reach out to the side just waist high.  Tr. 66.  She can reach forward, but it hurts.  Tr. 66.  She can reach to get something to eat or to use the remote control to change the television channel, but she cannot do it for very long.  Tr. 66.  She has a problem just bringing her arm down and then her shoulder will pop.  Tr. 66.  It is worse than before her replacement surgery because now she has limited mobility.  Tr. 67.  She has had problems reaching overhead since before her replacement surgery.  Tr. 67-68.  Also prior to her replacement surgery, she had problems writing "because I could never—I can't—I always continuously had the pain no matter what."  Tr. 69.  She also had problems doing something such as sewing or typing; it would hurt because of her shoulder.  Tr. 70.  Since

her shoulder surgery, she can button things and use zippers, but it hurts.  Tr. 70.  She also has some problems dressing.  Tr. 71-72.

Prior to her shoulder replacement surgery, Carr stated that she could lift maybe five pounds using both hands.  Tr. 72.  She explained that, for a while, her left shoulder started hurting because she was doing everything with her left hand.  Tr. 73.  Currently, she estimated that she could lift and carry one or two pounds.  Tr. 74.  She stated that she really doesn't lift anything because of her shoulder.  Tr. 74.

Carr stated that she cannot dust, run the sweeper, or do dishes.  Tr. 78.  Her fiancé comes over and does all her household chores.  Tr. 78.  She can cook; she eats a lot of microwave dinners.  Tr. 78.  When asked what she generally does during the day, Carr answered that she walks out to the patio and sits for a while.  Tr. 78.  She will come back in and sit or lie down on the couch because her back hurts.  Tr. 78-79.  Her mom may come pick her up and take her to her house, where she will visit with her grandmother.  Tr. 79.  She reads books and magazines during the day and watches television at night.  Tr. 80.  She is able to go grocery shopping.  Tr. 81.  She is on pain medication and has no side effects from it.  Tr. 81.  She sleeps badly at night because her shoulder hurts from lying on it.  Tr. 86.

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 86-97.  The ALJ asked the VE to determine whether a hypothetical individual of Carr's age, education and work experience could perform her past work or any other work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could not perform Carr's past work, but could perform other jobs in the national economy such as checker, routing clerk, and mail sorter.  Tr. 89-90.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her November 24, 2017, decision, the ALJ made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2017.  Tr. 13.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of October 17, 2012, through her date last insured of September 30, 2017.  Tr. 13.

3.    Through the date last insured, the claimant had the following severe impairments: right shoulder osteoarthritis, status post total arthroplasty (January 2015); right brachial neuritis; right knee osteoarthritis and meniscus tear, status post partial medial meniscectomy (August 2016) and knee replacement (June 2017); left knee chondromalacia patella; and degenerative disc disease of the cervical and lumbar spine.  Tr. 13.

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 16.

5.    Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) in that the claimant can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently.  She can sit for 6 hours out of an 8-hour workday and can stand and/or walk for 6 hours out of an 8-hour workday.  She must have the ability to alternate between sitting and standing, at her option, every 30 minutes for 1-2 minutes so long as she is not off task or has to

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

leave the vicinity of the workstation. The claimant can never climb ladders, ropes or scaffolds, kneel or crawl and can occasionally climb ramps and stairs, balance, crouch, and stoop. She cannot turn her neck to the extreme ranges but can move her torso to accommodate this action. She cannot reach overhead or to the rear with the dominant right upper extremity and can reach occasionally to the side and front. She can occasionally push and/or pull and frequently handle and finger with the dominant right upper extremity. She cannot walk on uneven terrain or work around unprotected heights or unprotected moving mechanical machinery. Tr. 16.

6.    Through the date last insured, the claimant was unable to perform any past relevant work. Tr. 25.

7.    The claimant was born in 1968 and was 49 years old, which is defined as a younger individual age 18-49, on the date last insured. Tr. 26.

8.    The claimant has a high school education and is able to communicate in English. Tr. 26.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 26.

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. Tr. 26.

11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from October 17, 2012, the alleged onset date, through September 30, 2017, the date last insured. Tr. 27.

**V. Plaintiff's Arguments**

Carr makes a number of challenges to the ALJ's decision: (1) the ALJ's RFC assessment is not supported by substantial evidence because the ALJ violated the treating physician rule, erred when she considered other opinion evidence of record, and erred when she did not permit VE testimony as to a repetitive use restriction; (2) the ALJ did not properly assess Carr's credibility; (3) Carr's absences for medical treatment exceeded employer tolerance; and (4) the

ALJ did not meet her burden of establishing alternative jobs that Carr could have performed despite her limitations.  Doc. 15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ failed to articulate her credibility assessment

To evaluate the credibility of a claimant's symptoms, an ALJ considers the claimant's complaints along with factors such as the objective medical evidence, treating or nontreating source statements, treatment received, and other evidence.  20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.  The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id*. at *4.  While deference is given to an ALJ's credibility determination, the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained.  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d

234, 248-249 (6th Cir. 2007).

Here, the ALJ's decision does not contain a sufficient explanation for how she evaluated Carr's allegations. The ALJ's sparse credibility assessment reads,

> In summary, while the claimant has medically determinable impairments that could reasonably cause some symptoms and limitations, including inability to return to prior employment, the allegations are considerably broader and more restricted than is established by the medical evidence. This is not to say that the claimant was symptom free or did not experience difficulty performing some tasks. However, the objective evidence does not demonstrate the existence of limitations of such severity as to have precluded the claimant from performing all work on a regular and continuing basis at any time from the alleged onset date of disability.

Tr. 25.

This explanation is insufficient. First, it is vague; the ALJ does not describe Carr's allegations of pain or limitations, does not state what difficulty she had performing what tasks, and does not describe the relevant objective evidence the ALJ found persuasive. Second, the ALJ refers only to objective medical evidence as a reason for discounting Carr's alleged limitations, but an ALJ may not rely only on objective medical evidence to discount a claimant's credibility. *See* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *5 ("[W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual.").

Moreover, contrary to Defendant's position, the balance of the ALJ's decision does not contain analyses that could serve as sufficient articulation for a credibility determination. Defendant argues that, elsewhere in her decision, the ALJ restated record evidence that Carr had no side effects from medication, was prescribed over-the-counter medication in January 2014, took ibuprofen for pain in March 2015, and engaged in certain daily activities. Doc. 16, pp. 13-14. But the ALJ's recitation of Carr's testimony, in which she merely repeated Carr's statements

regarding activities of daily living and medication side effects, is not an analysis or explanation. Nor is the ALJ's recitation of record evidence that Carr was prescribed over-the-counter medication.  These are simply recitations of fact, not an analysis of the facts.

Furthermore, Carr was prescribed over-the-counter pain medication in January 2014, after her second, failed SLAP tear surgical procedure and prior to her referral for a second opinion, an Ultram prescription, and shoulder replacement surgery.  In this context, the fact that her surgeon prescribed over-the-counter medication after her second, failed shoulder surgery (and after she had been on narcotic pain medication for at least five months)[4] prior to referring her for a second opinion and third surgery does not support the ALJ's assessment that Carr's allegations of shoulder pain were not entirely credible.  In short, the ALJ failed to articulate how she evaluated Carr's credibility, including complaints of pain, and the ALJ's decision, therefore, must be reversed and the case remanded.  *See* SSR 16-3p, 2017 WL 5180304, at *4 (The ALJ's credibility determination must be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."); *Schroer v. Comm'r of Soc. Sec.*, 2018 WL 3145846, at *5 (N.D. Ohio June 12, 2018) (remanding because the ALJ's decision failed to meet the articulation requirements of SSR 16-3p).

As discussed below, the ALJ's error with respect to her credibility determination compromised her analysis of the opinion evidence.

### B. The ALJ failed to articulate her assessment of opinion evidence and improperly cut off development of VE testimony

#### 1. The ALJ's consideration of opinion evidence

Carr challenges the ALJ's consideration of the two opinions of Dr. Nye, Carr's treating

---

[4] See, e.g., Tr. 378 (August 2013 note from Dr. Sanko's office listing Carr's medications, including Norco); 841 (September 2013 note wherein Dr. Sanko renewed her Vicodin prescription); Tr. 370 (December 2013 treatment note stating that Dr. Sanko refilled Carr's pain medication prescription, to be used sparingly, and stated that Carr may have to see a pain management specialist).

physician, as well as the ALJ's evaluation of other opinion evidence, including the opinions of the state agency reviewing physicians.  Doc. 15, pp. 15-17.

Carr asserts that the ALJ erred when she cited normal EMG testing as the reason for discounting Dr. Nye's assessed right upper extremity limitations.  Carr submits that the EMG testing was done to rule out cervical radiculopathy, not for her shoulder problems.  Doc. 15, pp. 16-17.  In other words, Carr argues that Dr. Nye's assessed right upper extremity limitations related to her shoulder, which the EMG was irrelevant to.  Carr thus concludes that the ALJ's explanation is faulty.

Dr. Nye did not provide an explanation for any of his assessed limitations in either of his two, very short, check-box opinions.  It cannot be ascertained from these two opinions whether Dr. Nye assessed limitations regarding Carr's right upper extremity due to her shoulder or her cervical spine issues, both of which he treated.  See, e.g., Tr. 1071.  The ALJ, apparently, assumed the manipulative limitation was due to Carr's cervical spine problems, while Carr argues that her manipulative limitations were due to her shoulder problems.  Tr. 113.  Notably, the state agency reviewing physicians assessed Carr with manipulative limitations due to her shoulder problems, Tr. 113, 131, so there is additional support in the record for Carr's argument.  Although the ALJ gave the state agency reviewing physicians' opinions regarding Carr's physical RFC "less weight" than their opinions regarding Carr's mental RFC, the ALJ did not sufficiently explain why she did so, or what portions of the opinions she discounted.  Tr. 25.  Because the ALJ failed to articulate her assessment of Carr's credibility regarding her shoulder pain and limitations *and* her assessment of the state agency reviewing physicians' opinions, the undersigned is unable to determine whether the ALJ's assumption—that any assessed upper extremity manipulative limitation was only caused by Carr's cervical impairment—is supported

by substantial evidence.

Additionally, the ALJ gave "no weight" to Dr. Nye's opinion regarding Carr's pain, "as it is not explained although pain complaints have been considered and incorporated into the assigned residual functional capacity by way of reduced postural and imposing of environmental restrictions." Tr. 25.  As described above, however, the ALJ did not sufficiently explain her findings with respect to Carr's complaints of pain.  And the ALJ's blanket statement that Carr's pain complaints were considered by way of postural and environmental limitations is insufficient; the ALJ does not state which of those limitations were assessed based on which of Carr's many symptoms and alleged limitations.[5]  On remand, the ALJ will have an opportunity to revisit and reassess Dr. Nye's opinions as well as the opinion evidence of the state agency reviewing physicians.

### 2. Hearing testimony

Carr also challenges the ALJ's refusal, during the hearing, to allow her attorney to ask the VE what effect it would have on the availability of the jobs the VE identified if "the hypothetical individual could not do repetitive right upper extremity activities." Tr. 95.  This question was based on Dr. Hoover's opinion rendered in connection with Carr's BWC claim that Carr could perform "no repetitive activities" with her right hand.  Doc. 15, p. 18; Tr. 95-98.  The ALJ would not let the VE answer the question posed by counsel, insisting that "repetitive" needed to be defined and rejecting counsel's attempted definition.  Tr. 95-98.  Defendant contends that the Dictionary of Occupational Titles ("DOT") does not define "repetitive" and that, therefore, the ALJ was justified in "rejecting counsel's questioning of the VE regarding 'repetitive' use of right upper extremity." Doc. 16, pp. 11-12.  But neither the ALJ nor the VE objected to the question

---

[5]  In addition to shoulder problems, Carr suffers from lumber disc disease and has problems with both of her knees, including having had two right knee surgeries.

based on "repetitive" not being defined in the DOT.  The ALJ simply refused to let counsel ask

the VE the question based on the ALJ's apparent dislike of the term.  The ALJ also answered on

behalf of the VE, and at one point, essentially coached the VE to respond that the question was

not specific enough.  Tr. 96-97.  In any event, it does not appear that "repetitive" is an outlier in

the vocational context such that the question should have been refused, rather than permitted to

be asked and then clarified through additional questioning.  *See, e.g., Hensley v. Astrue*, 573 F.3d

263, 265-267 (6th Cir. 2009) (discussing opinion evidence and VE testimony regarding a

limitation of "repetitive" pushing and pulling while reversing the decision of the Commissioner).

On remand, this error can be rectified as well.[6]

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's

decision be **REVERSED and REMANDED** for proceedings consistent with this opinion.


Dated: April 24, 2019

/s/ *Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge


### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after the party objecting has been served with a copy of this Report and
Recommendation.  Failure to file objections within the specified time may waive the right to
appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).
*See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[6] Carr also claims that she had so many medical appointments, she would have been absent from work in excess of
an employer's tolerance, per the VE's testimony.  Doc. 15, p. 20.  It does not appear that Carr presented this
argument to the ALJ.  She will have an opportunity to do so on remand.